257 So.2d 723 (1971)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS
v.
Maurice J. MAYER, Jr., et al.,
No. 8269.
Court of Appeal of Louisiana, First Circuit.
April 19, 1971.
On Rehearing December 20, 1971.
Rehearing Denied January 31, 1972.
Writ Refused April 6, 1972.
*726 Ralph L. Kaskell, Jr., of Deutsch, Kerrigan & Stiles, New Orleans, for appellant.
Charles William Roberts, Baton Rouge, for State of La., Hwy. Dept.
Before LANDRY, ELLIS and BLANCHE, JJ.
On Rehearing En Banc December 20, 1971.
En Banc Rehearing Denied January 31, 1972.
LANDRY, Judge.
In this expropriation proceeding, conducted pursuant to LSA-R.S. 48:441 et *727 seq., the Quick Taking Statute, defendants-owners appeal the judgment of the trial court awarding $45,661.80 for property taken in fee and for a temporary construction servitude, and $21,692.00 severance damages. The land in question was taken for construction by the Department of Highways (Department) of a segment of interstate expressway I-10 and a diamond shaped interchange connecting I-10 with South Acadian Throughway (Acadian), a four-lane, blacktopped artery which is one of the principal north-south traffic routes in the City of Baton Rouge.
On January 14, 1963, the Department deposited in the registry of court the sum of $54,299.00, of which sum $32,607.00 was designated as compensation for land taken, and $21,692.00 was tendered as severance damages. The lower court increased the award for land taken by $13,044.80, but declined to increase severance damages. At the commencement of trial, the Department orally moved to amend its petition to allege that no severance damages were due, and that any severance damages due were offset by special benefit accruing to the remainder of defendants' property as a result of the taking. Upon defendants' objection, the court reserved its ruling on the question.
Narration in some detail of the rather unusual facts attending this litigation is necessary to a proper understanding of the numerous issues raised by defendants' appeal and plaintiff's answer thereto.
From a tract consisting of 23.433 acres, situated virtually in the geographical center of the City of Baton Rouge, three parcels were taken. Subject tract is situated in the midst of improved areas and some prime residential subdivisions, and is one of few tracts so located. Before the taking, the property was bisected by Acadian which runs through the tract in a generally northerly-southerly direction. The smaller portion of the property, located west of Acadian, was in turn divided by a canal known as Dawson Creek (canal), which was approximately 90 feet wide and 20 to 25 feet deep, and which ran through this area of the tract in an east to west direction. In essence, subject property consisted of three separate tracts. The largest usable area contained 10.628 acres and was situated north and east of Acadian; 6.313 usable acres were situated west of Acadian and north of the canal; 3.583 usable acres were located west of Acadian and south of the canal, a total of 20.524 usable acres. The remaining 2.909 acres were situated in the canal. Of the 10.268 acres north and east of Acadian, the north 8.0596 acres were zoned A-3 (Two Family) Residential, and the remaining or southern part, consisting of 2.5684 acres was zoned A-1 (One Family) Residential. Zoning of the 6.313 acres west of Acadian and north of the canal was as follows: The north .7414 acres thereof was A-3 and the south 5.5716 acres was zoned A-1. The 2.482 acres west of Acadian and south of the canal was zoned entirely A-1. In addition, defendants owned a small parcel of land east of Acadian and south of the 10.628 acre parcel, which small plot was situated entirely within the canal and separated from the larger tract by property of third persons.
In crossing defendants' property from east to west, I-10 involves a total taking of 7.191 acres, of which 1.529 acres comprised part of the canal and were subject to a servitude of drain. Of the 5.662 acres of usable land taken, 1.557 acres were expropriated from the southern part of the 10.628 acre tract situated north and east of Acadian leaving 9.071 acres in that parcel; 3.064 acres were extracted from the southern part of the 6.313 acres lying west of Acadian and north of the canal, leaving 3.249 acres of that parcel, and 1.041 acres were taken from the northern part of that area situated west of Acadian and south of the canal, leaving 2.542 acres in that parcel. The taking from the area situated north and east of Acadian involved only property zoned A-1, thereby reducing the A-1 acreage of that parcel from 2.5684 *728 acres to 1.0114 acres. Prior to the expropriation, the tracts fronted 1323.4 feet on the east side of Acadian and 1448.84 feet on the west side of Acadian, a total frontage of 2772.24 feet. After the taking, this frontage was reduced to 1079.93 feet, of which 469.4 feet were on the east side of Acadian and 610.53 feet were on the west side of Acadian. On March 10, 1965, prior to trial, the remaining tract north and east of Acadian had been rezoned from A-1 and A-3 to A-4, which latter classification permits construction of apartments.
The case was tried in November, 1965. The Department has answered the appeal contending that the award for property taken should be reduced to the initial deposit of $32,607.00, and that the award for severance damages should be set aside and ordered refunded by defendants, together with interest and costs. Additionally, the Department has moved to remand this cause to the lower court to permit the showing of alleged occurrences subsequent to trial which would establish that no severance damages are due appellants because portions of the remainder of defendants' property have been rezoned Commercial and leased by defendants at rentals reflecting a value in excess of $38,000.00 per acre. This motion to remand was countered by affidavits presented by defendants showing that the increase in value of subject property subsequent to trial resulted solely from an expanding local economy.
On trial of this matter, appellants' prime contention was that the value of the usable acreage taken should be fixed at that price which a willing and informed seller would accept and a willing and informed buyer would pay for the precise parcels taken, size, shape and location considered.
Defendants called four experts, namely, Sam Dupree, Civil Engineer, and three appraisers, namely, Kermit Williams, Verdie Reese Perkins, and Warren Munson, to establish their claim for property taken and severance damages. The Department produced two appraisers, namely, Chester Driggers and Darrel Willet. All experts agreed that the best and highest use of subject property at the time of taking was A-1 residential.
Williams, using comparables, appraised the land at $9,000.00 per acre, or $184,158.00, for the 20.462 acres in subject tract. This fixed the value of the 5.662 acres taken at $50,400.00. In so finding, Williams utilized these comparables: (1) Transfer from Lewis Gottlieb to the City of Baton Rouge in 1960 of 5.429 acres located less than a mile from subject tract for $38,545.00, or $7,099.00 per acre; (2) a sale from Bridge City Realty Company to the Baton Rouge Diocese of the Catholic Church on July 10, 1962, of 11.34 acres located less than one-quarter mile from subject property and fronting on Acadian for $100,000.00, or $8,818.00 per acre; and (3) three sales from the Jolly family in September, 1962, of 32.39 acres located ¾ths mile from subject property for a total of $241,500.00, or $7,456.00 per acre. Williams noted a sale in 1959 from Gottlieb to the East Baton Rouge Parish School Board of 11.171 acres located less than one mile northeast of subject property for $86,570.00, but rejected it as a comparable because it was too remote in time from the taking. Adjusting the comparables for time, location, size and frontage, he adjusted the per acre value of the Gottlieb to City of Baton Rouge property upward 30% of its $7,100.00 per acre price, or to the sum of $9,230.00 per acre. Williams reasoned that a 10% upward adjustment was in order because the Gottlieb sale occurred in 1960, an additional upward adjustment of 10% was warranted because of the inferior location of the Gottlieb tract, and a final upward adjustment was in order because it had no frontage. A downward adjustment of 10% was utilized because the Gottlieb property, being smaller in size, would bring a higher per acre price.
The Catholic Diocese sale at $8,018.00 per acre was adjusted to $8,820.00 per acre. The value thus reached resulted from a 5% increase because the sale occurred *729 in July, 1962; a reduction of 5% due to its more favorable location; a 10% increase because the Diocese property had less frontage than subject tract. The Jolly sales were for $7,553.00 per acre, which Williams adjusted to $9,065.00 an acre. A 5% upward adjustment was made because the transactions occurred in September, 1962. Subject property, being less favorably located than the Jolly property, the comparable was reduced 5%. An upward 10% adjustment in the Jolly property was also made because subject tract had more frontage.
Williams expressed the view that a seller would not normally sell such irregular portions of a tract as the parcels taken, especially since the areas expropriated comprised such a large part of the frontage of defendants' property. He was emphatic on the point that such irregular plots should bring a higher market price than the average per acre value of the entire 23.43 acre tract. The remaining property north of the interstate, that is, 9.071 acres north and east of Acadian and 3.249 acres south of Acadian and north of the canal, a total of 12.32 acres, Williams valued at $4,000.00 per acre after the taking, or a total of $49,280.00. The remaining 2.542 acres south of Acadian and south of the canal, he valued at $3,500.00 per acre, or $8,898.00 after the taking. He assessed severance damages of $76,138.00 to the remainder predicated on factors such as noise, danger and litter resulting from proximity to the expressway and ramps and the reduced frontage of subject property. He considered that no net appreciation in value accrued from the construction of the interstate. He also stated that division of the property by the interstate was not a salient factor because the property was divided by Acadian and the canal before construction of I-10.
Williams valued the .050 acres taken from the canal bed at between $400.00 and $500.00. The .157 acres, used for a temporary servitude, he valued at $300.00 to $400.00. He also stated that the acreage within the canal was worth $9,000.00 per acre, but could not be sold separately for that price. He explained that the canal acreage would be worth $9,000.00 per acre to a developer as a required outfall channel.
Mr. Williams stated he believed the highest and best use of the property after the taking was for some sort of residential development. He did not evaluate the property as though it were zoned A-4 because such classification did not attach until after the taking. He further stated that a future zoning change could not have been contemplated at the time of taking because his experience has been that such requests for zoning changes have been denied. According to Williams, even though part of the property was zoned A-3 when taken, this did not prevent its use as A-1 property. In recapitulation, Williams estimated total damages at $127,438.00, itemized as follows: Usable land taken (5.662 acres) $50,400.00; Canal area taken (.050 acres) $500.00; temporary servitude (.157 acres) $400.00; severance damages, $76,138.00.
Verdie Reese Perkins deposed the property was best suited for A-1, or single family residences. Utilizing comparable sales, he valued subject property at $8,000.00 an acre. The comparables he employed were: (1) The Jolly sales at $7,000.00, $7,650.00 and $8,000.00 per acre, respectively; (2) the sale from Bridge City Realty to the Roman Catholic Diocese for $8,818.00 per acre, and (3) the Gottlieb sale to the School Board for $7,750.00 an acre. Declining to adjust such comparables, Mr. Perkins evaluated subject property as the average value of the comparables, or $8,050.00 per acre, which he rounded off to $8,000.00 per acre. Using this valuation, he assessed the usable acreage of subject property at $164,192.00. He valued the canal area at $1,000.00 per acre, or a total of $1,470.00. His appraisal of the 5.662 usable acres taken was therefore $45,296.00.
*730 Mr. Perkins noted that a willing seller would not chop up his property and sell it in such irregular shapes as those taken in the expropriation proceeding. He stated that an informed seller would require either that a purchaser take additional property to give the land a reasonable shape or set a price in excess of the average per acre value of the tract to compensate for the diminution in value resulting from selling off such irregular plots. Mr. Perkins also stated that since twice the frontage was taken in relationship to the acreage, a price of twice the per acre average value of the entire property would adequately compensate the owners for the land taken.
Mr. Perkins valued the remainder at $4,000.00 per acre and computed severance damages at $59,448.00. He deemed severance damages were due because the taking left the remainder in a peculiar shape, and subject to noise, trash dumping and litter from traffic using the new interstate. He did not set a value on the small tract situated southeast of Acadian and separate from the principal tract. Mr. Perkins' total assessment of compensation aggregated $106,243.00, consisting of $45,296.00 for 5.662 usable acres taken; $1,479.00 for the Canal area taken, and $59,448.00 severance damages.
Mr. Perkins also stated that zoning changes are most unpredictable, and that the advent of I-10 did not cause the subsequent zoning change of subject property to A-4 classification. He further stated that at the time of taking, there was no great demand for A-4 property, but that such demand did exist at the time of trial. He stated that the part presently zoned A-4 is worth $16,000.00 per acre, or $145,000.00 ($16,000.00 X 9.071 acres). He was of the opinion that construction of an interchange does not bring about a zoning change, but that such changes result solely from efforts exerted by an owner. He also stated that in valuing properties adjacent to an interchange, each instance must be considered separately in the light of its own peculiar circumstances.
Mr. William Warren Munson appraised the property as though it were three separate tracts, each suited for a different use. He considered its best and highest use to be for residential purposes. In valuing the property, he used the following comparables: (1) A sale from Gottlieb to the Catholic Church on July 10, 1962, of 11.2 acres for $100,000.00, or $8,818.00 per acre; (2) the Jolly sales in September, 1962 of 29 acres for $200,000.00, or $7,650.00 per acre; (3) a transfer from Ralph M. Ford to Joseph M. Myatt, in November, 1957, of 9.97 acres located ten blocks from subject property, for $120.000.00 or $12,000.00 per acre; (4) a sale of 3.24 acres located at the end of Hyacinth Street, on August 2, 1957, for $52,000.00, or $16,049.00 per acre, and (5) a sale from B. F. Carrol to Duboise A. Vann in June, 1961, of 2.8 acres for $28,000.00, or $10,000.00 per acre. Munson valued the property north and east of Acadian at $9,770.00 per acre. He appraised both tracts south of Acadian at $9,053.00 per acre. The 3.064 acres taken from the area south of Acadian and north of the canal, he valued at $27,738.00; the 1.041 acres taken from the area south of Acadian and south of the canal was valued at $9,424.00, and the 1.557 acres taken from the area north and east of Acadian was valued at $15,221.00. Munson's valuation of the total acreage taken was $52,383.00. He valued the 2.542 acres remaining south of Acadian and south of the canal at $3,570.00 per acre after the taking, or $8,974.00. The 3.249 acres remaining in the area south of Acadian and north of the canal, he valued at $6,310.00 per acre after the taking, or $21,439.00. The 9.071 acres remaining in the area north and east of Acadian, Munson valued at $6,590.00 per acre after the taking, or a total of $59,777.89. His aggregate of severance damages was $52,856.00, which was composed of $14,013.00 in damages to the area south of Acadian and south of the canal; $7,989.00 in damages to the area south of Acadian and north of the canal; and $30,854.00 in damages to the parcel remaining north and east of Acadian. The 1.479 *731 acres taken from the canal were valued at $1,000.00 an acre, or $1,479.00; the smaller separate tract, he valued at $200.00. The aggregate of his damages was $106,918.00.
Mr. Munson stated that the sale of an irregular plot from a parent tract results in diminution in value of the remainder. He did not use comparables to arrive at the remainder value of subject property because the remainders were of such irregular size and shape. He determined remainder value by the extent to which a subdivision developer could have utilized the remainder for residential sites. He further observed that the irregular plots taken would ordinarily be "squared off" in a private transaction. On this basis, such a sale would aggregate 10.662 acres instead of the 5.662 acres taken. The value of 10.662 acres at $9,310.00 per acre would be $99,630.00. However, the clear import of Munson's testimony was that the severance damages deposited by the Department would adequately compensate defendants for the irregular plots taken.
Mr. Munson considered that the rezoning of that area north and east of Acadian to A-4 subsequent to the taking occurred despite construction of I-10, and not because of said construction. He explained that he so believed because a zoning change allowing construction of apartments on the site would congest and impede the flow of traffic on and off access ramps. He also considered that this particular part of the remainder would be presently worth approximately $30,000.00 an acre zoned A-4 with the expressway not in existence. He felt that the presence of the expressway reduced this value to between $20,000.00 and $25,000.00. He also stated that the value of subject property zoned A-4 would have been $15,000.00 per acre in 1963.
Mr. Darrel Willet, who testified for the Department, did not view the property until after the project was under construction. Based on consultation with the Department's appraisers who made the initial valuation on which the Department's deposit was predicated, and his own extensive investigation, Willet appraised the property using the following comparables: (1) A sale from Pruyn Realty Company, Inc. to William T. Baynard in June, 1960, of 10.53 acres zoned A-3 for $63,000.00, or $6,030.00 per acre, the property being situated 8 blocks east of defendants' land; (2) a sale to Consolidated Development Corporation in September, 1962, of 31.58 acres zoned A-1 for $241,500.00, or $7,647.00 per acre, and (3) a sale from Bridge City Realty Company, Inc. to the Catholic Church in July, 1962, of 11.34 acres zoned A-1, for $100,000.00 or $8,818.00 per acre. Willet valued that portion of the property situated north and east of Acadian and zoned A-3 at $9,000.00 per acre if used as A-1 property, and $10,000.00 per acre if used as A-3 property. Thus, he valued the 8.0596 acres thereof zoned A-3 at $80,596.00. In his opinion, construction of the expressway increased the value of the A-3 zoned portion of this particular part of subject tract to $15,000.00 per acre, or $120,894.00. He considered this enhancement a special benefit to this particular portion of the remainder to the extent of $40,298.00. He noted that on March 10, 1965, this particular remainder was zoned A-4, making the entire remainder worth $181,341.00, resulting in a special benefit to this particular remaining part in the amount of $100,745.00.
The southern part of the parcel lying north and east of Acadian and zoned A-1 at the time of taking, was valued by Willet at $12,500.00 per acre when taken. Thus, he fixed the value of the 1,577 acres taken from this area at $19,463.00. He valued the remaining 1.014 acres zoned A-1 at $4,000.00 after the taking. Since he had valued this segment at $12,500.00 before the taking, he determined that the remaining 1.014 acres thereof, zoned A-1, suffered a decrease in value of $8,641.00. He also found that the subsequent rezoning of this 1.014 acres to A-4 increased its value to $17,000.00 or $17,500.00 per acre.
*732 The small tracts situated in the canal, located east of Acadian and separated from the major tract, were valued by Willet at $1.00 each.
Willet assigned a value of $7,000.00 per acre, based on comparables, to the parcel situated south of Acadian and south of the canal, a total of $25,081.00 for the whole 3.583 acres prior to the taking. The remaining 2.542 acres were deemed to have a reduced value of $4,000.00 per acre after the taking, or a value of $10,168.00 for this particular remainder. Severance damages to this parcel were fixed at $7,626.00, the difference between the pretaking value of $17,794.00, and the after taking valuation of $10,168.00. At the time of trial, the remaining 2.542 acres had increased in value to $5,000.00 per acre.
The A-1 zoned portion of the parcel lying south of Acadian and north of the canal comprising 5.5716 acres, Willet valued at $8,500.00 per acre before the taking, or a total of $47,359.00. From this area, 3.064 acres were expropriated. Willet valued this 3.064 acres at $26,044.00. The unexpropriated remaining 2.5076 acres was valued at $21,315.00 before the taking. After the taking, the remaining 2.5076 acres was valued at a total of $6,000.00. Severance damages to this area were fixed at $15,315.00, the difference between the $21,315.00 value assigned the remainder prior to trial and the $6,000.00 value allotted thereto as a result of the taking. Willet also testified that the value of this remaining 2.5076 acres was $4,000.00 per acre at the time of trial, or a total of $10,030.00.
Willet valued that portion of the tract south of Acadian and north of the canal which was zoned A-3 at $10,000.00 per acre when taken, and $15,000.00 per acre after the taking. He thus determined this segment of the property received special benefits in the amount of $3,707.00. As of the time of trial, he considered this area worth $17,500.00 per acre, resulting in a special benefit to the owners of $5,561.00 as of the date of trial.
Defendants objected to the Department introducing evidence showing an increase in value due to the taking in diminution or offset of severance damages because the Department's petition admitted owing severance damages. The Department maintained, on authority of State v. Baddock, La.App., 170 So.2d 5, that it has the right to show that severance damages deposited are not in fact due, either by amendment of its petition or the production of competent testimony establishing such fact. The trial court, relying upon Baddock, above, and the terms of the pertinent statute, ruled that without amendment, the Department could introduce evidence of special benefits to the remainder of defendants' property but only to the extent of showing that severance damages due are limited to the amount of such damages initially deposited. The trial court also ruled on authority of Baddock, above, that an expropriator may amend to disclaim severance damages previously admitted only where the petition is amended, reasons given, and notice afforded the owner.
Subject to the aforesaid ruling, Willet testified that the aggregate value of property taken was $52,796.00. The remainder he valued at $129,760.00 before the taking, and $152,183.00 immediately after the taking and before the zoning change to A-4, thus indicating an increase in value due to the taking. He also stated that, as zoned at the time of taking, the remainder, including all special and general benefits, was valued at $139,760.00, whereas, as zoned A-4 as of time of trial, this same remainder was worth $234,756.00, including both special and general benefits resulting from the project. Willet conceded that a landowner would not voluntarily sell parcels of his land in the size, shape and location of the expropriated tracts unless he was compensated on other than a per acre average value of the entire property. He was of the opinion that knowledge of the *733 proposed interstate and diamond interchange on Acadian hastened a demand which occasioned a need for a change in subject property from an A-1 and A-3 zoning classification to an A-4 zoning. He believed the expressway and interchange was the prime force leading to this change.
Mr. Chester Driggers, the Department's expert, considered the highest and best use of subject property to be for single family residential purposes. In determining market value, he used the Gottlieb to School sale which reflected a unit price of $7,750.00 per acre. He also considered a sale from Pruyn Realty Company to William T. Baynard in June, 1960, of 10.53 acres for $63,000.00, or $6,030.00 per acre, and a sale from Frank Barber to the East Baton Rouge School Board in November, 1957, embracing 4.322 acres for $33,696.00, or $7,796.00 per acre. Driggers valued the usable 20.524 acres of subject tract at $5,750.00 per acre, or $118,013.00. The small area taken from the canal, he valued at $10.00. The temporary servitude, he valued at $10.00. He also placed a value of $20.00 on fencing destroyed. He valued the 1.55 acres taken from the tract north and east of Acadian at $8,953.00, and the 4.105 acres taken from the two areas south of Acadian at $23,604.00. His total for all property taken or used, and for fencing destroyed, amounted to $32,607.00.
Driggers found no severance damages accruing to the remaining area north and east of Acadian. The parcel lying south of Acadian and north of the canal, he valued at $2,000.00 an acre after the taking, or a total of $6,498.00. The remainder lying south of Acadian and south of the canal was also valued at $2,000.00 per acre, or an aggregate of $5,084.00. By subtracting the sum of the value of the land taken ($32,607.00), and the value of the remainder ($63,741.00) or $96,348.00, from the value of the whole before the taking ($118,040.00), he found severance damages of $21,692.00, the amount deposited by the Department upon filing suit.
Mr. Driggers did not consider the Diocese sale to be a true comparable because the former tract was superior to subject property in location and elevation. He also observed that he did not utilize the Jolly sales as comparables.
Driggers attributed severance damages to the two remaining parcels situated south of Acadian due to their reduced size, irregular shapes and their greatly reduced frontages. He considered that the large tract remaining north of Acadian suffered diminution in value because of the reduction in frontage resulting from the taking. He also found that this latter tract benefited by the new construction to an extent which offset any loss in value attributable to its reduced frontage.
The lower court found the value of the usable property taken to be $8,000.00 per acre or an aggregate of $45,296.00 for 5.662 acres, an increase of $13,324.80 over the amount deposited by the Department. The 1.529 acres within the canal were valued by the trial court at $200.00 an acre, or $305.80. The sum of $50.00 was awarded for the temporary servitude.
In so finding, the trial court disregarded Driggers' testimony on the ground it varied unreasonably from that of the other appraisers. This difference the trial court attributed to the fact that Driggers relied heavily on the Pruyn Realty to Baynard sale, a transaction the court did not consider a true comparable. The trial court also observed that defendants' witnesses were thoroughly familiar with the area involved whereas the Department's remaining witness, Willet, was not. Relying on State, Through the Department of Highways v. Singletary, La.App., 185 So.2d 642, the trial court accorded greater weight to defendants' experts on the ground that they were more familiar with property values in the area in which subject property is situated.
Relying on State, Through Department of Highways v. Christ Baptist Church, La.App., 197 So.2d 83, the trial court held *734 that severance damages are to be computed as of the time of trial. The court also held that an owner seeking an increase in damages must establish that severance damages deposited by the Department are less than severance damages alleged to have been sustained. The Department, however, to recover or reduce severance damages deposited, must show that such damages actually incurred were less than the deposited amount. The trial court concluded the Department failed to discharge the burden of showing that the subsequent zoning change to A-4 resulted from the taking, and that the increased value arising therefrom should be considered in diminution or complete offset of severance damages initially deposited. The basis for this finding was that the Department's evidence on this score was too speculative. On this premise, the trial court ruled that plaintiff's offer to amend its petition was rendered moot and also ruled that defendants were entitled to the amount deposited as severance damages herein. In addition, the trial court awarded expert witnesses' fees as follows: Sam Dupree, $300.00; Verdie Reece Perkins, $750.00; Kermit Williams, $750.00, and William Warren Munson, $750.00.
Appellants-defendants allege that the trial court erred in the following respects:
1.Holding that the 5.662 acres, outside of Dawson Creek, taken in the expropriation were worth only $45,296.00.
2.Excluding evidence of the income that would be derived from and the cost of the development of an A-1 subdivision on the property before and after the taking, offered for the purpose of verifying what a developer would pay for the raw acreage.
3.Admitting (a) evidence of the alleged value of the remaining property as of November 1965, although the property was taken January 1963; (b) evidence of zoning changes from A-3 to A-4 residential made in the remainder of the property more than two and one-half years after the taking; and (c) evidence of the possibility of further zoning changes to commercial uses.
4.Permitting the condemnor to offset real or imagined benefits, general or special, against the value of the land taken.
5.Allowing the condemnor to offset general benefits.
6.Failing to recognize that the burden of proving special benefits was on the condemnor and as a result, placing the negative burden on condemnee.
7.In permitting speculation on the possibility of future zoning changes from residential to commercial usage.
8.In holding that there was no proof of any severance damage beyond $21,692.00.
9.In valuing the 1.479 acres, which were burdened with a servitude of drain, at $200.00 an acre, or a total of $305.80.
10.In allowing only $50.00 for the temporary servitude.
11.In limiting the owners' recovery for the fees of its experts to the following:

Sam Dupree, engineer $300.00
Verdie Reece Perkins, realtor 750.00
Kermit Williams, realtor 750.00
Warren Munson, realtor 750.00

This court will first consider defendants' contention that the property taken should be assigned a value in excess of the per acre average price because it constituted the heartland of defendants' 23.44 acre tract. In this regard, defendants maintain that a premium price for the expropriated property is justified because considerable frontage on Acadian was taken.
Mr. Williams acknowledged that the irregular plot taken should bring a higher market price than the per acre average price especially since the property expropriated included such a large segment of the frontage from the subject tract. Mr. Perkins conceded that since twice the frontage was taken in relationship to *735 acreage, a price of twice the per acre average value would be reasonable as compensation for the taking. Mr. Munson noted that such an irregular plot would normally be squared off in a private sale. Such sale, he testified, would then involve 10.662 acres at $9,310.00 per acre instead of only 5.662 acres. Yet Mr. Munson asserted that the taking of such an irregular plot would be compensated for by the award of severance damages. Mr. Willet observed that a landowner would not willingly sell the expropriated property because of its irregular shape unless he was compensated on other than a per acre average basis.
It is well established that the compensation to be awarded in expropriation suits is the market value of the property taken, that is, the price which would be agreed upon between a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances. State, Through Department of Highways v. Hayward, 243 La. 1063, 150 So.2d 6; State Department of Highways v. Landry et al., La.App., 171 So.2d 779. It is the consensus of expert opinion herein that a willing seller would sell and a willing buyer would buy these expropriated parcels for a price in excess of the per acre average price. With this conclusion, we agree. No informed seller would carve such irregular shaped plots, including much of his vital frontage, from the virtual core of a tract of land so situated, without requiring a considerable premium therefor.
In Green et al. v. Board of Com'rs of Lake Borgne Basin Levee District, 163 La. 177, 111 So. 619, the front portion of a 1.53 acre residential tract was expropriated. The court awarded a value of $400.00 in addition to the per acre average value for the parcel taken. In the course of its opinion, the court explained the rationale for such conclusion as follows:
"But in our opinion it is not a mere matter of arithmetic. It is quite true that the total value of the whole land must be taken to be its assessed value, but it does not follow that each acre of land in a single tract must be taken to have exactly the same value as every other acre therein, that acres of arable land, acres of marsh land, acres of wooded land, and acres of bare land, all have the same value, that orchards and vineyards are not to be distinguished from stonelands and pastures merely because they are all included in one tract."
In Louisiana Highway Commission v. Guidry, 176 La. 389, 146 So. 1, a right of way 150 feet wide was taken from defendant's plantation, splitting it into two large tracts. The court not only awarded a price in excess of the per acre average price, but also allowed severance damages. In so holding, the Court observed:
"It needed higher ground, and that which it selected is the highest and best defendant has. For that reason, and for the further reason that plaintiff seeks to expropriate only a narrow strip, a small acreage running through the middle of the plantation, we must hold that the value of the land sought should be placed considerably higher than the average value of the land as a whole."
In State Department of Highways v. Landry, La.App., 171 So.2d 779, 1.3 acres of highway frontage was taken from a 25 acre tract. Although the tract still fronted entirely on the highway after the taking, a value in excess of the per acre average price was assigned the parcel taken. In State Department of Highways v. LeDoux, La.App., 184 So.2d 604, a strip 1600 feet by 85 feet, constituting 2.194 acres, was taken from the front of a 41 acre tract located on a highway. The court, in valuing the property taken in excess of its per acre value, noted as follows:
"A majority of this court, however, has determined that under the circumstances presented here the defendant landowner is entitled to recover the highest per-acre or square-foot market value of the frontage property `squared off' to a depth *736 which would be most suitable for commercial purposes, even though the property actually taken does not have sufficient depth to accommodate commercial development."
In Parish of East Baton Rouge v. Stipe, La.App., 231 So.2d 665, wherein a greater than average per acre value was allowed for property taken and severance damages also awarded, the court held:
"The same rule should be applied across the board, that is, the landowner should not receive just the average when the most valuable portion is taken and the expropriating authority should not pay the average when the least valuable portion is involved."
The same result was reached in State Department of Highways v. Moyse et al., La.App., 151 So.2d 149.
The cited authorities establish beyond question that compensation for acreage taken by expropriation is not limited to the per acre value of the property as a whole. Where the more valuable portion of a tract is expropriated, the value of the parcel or parcels actually expropriated is the measure of compensation due the landowner, not its per acre value as a component of the whole. These same authorities also make it clear that the granting of severance damages cannot be utilized as justification of an award of less than that amount a willing seller would accept and a willing buyer pay for the property actually taken, size, shape and location considered. See also LSA-R.S. 19:9.
We note that Mr. Munson suggested "squaring off" the parcels expropriated to ascertain what a willing seller would accept and a willing purchaser pay for the property taken. This method of evaluation was expressly approved in LeDoux, above. Utilizing the "squaring off" principle, Mr. Munson determined 10.662 acres would be involved at a per acre value of $9,310.00, or an aggregate value of $99,263.22 for the land taken. Mr. Perkins valued the parcels taken at twice its component per acre value of $8,000.00, or $90,592.00. Considering the size, shape and location of the parcels taken, and the fact that more than half the former Acadian frontage was lost by defendants, we find Mr. Perkins' valuation of $90,592.00 represents the fair value of the land taken in this instance.
We cannot say that the trial court erred in finding that $200.00 per acre constituted just compensation for the 1.529 acres taken from the canal area. We note, as did the trial court, that the expert testimony is in hopeless conflict on this issue. Messrs. Perkins and Munson valued the area subject to the canal servitude at $1,000.00 per acre. Messrs. Driggers and Willet appraised this same area at $10.00 and $1.00, respectively. In awarding $200.00 for this acreage, or an aggregate of $305.80, the trial court relied on Gulf States Utilities Company v. Comeaux, La. App., 182 So.2d 185, wherein the court assigned significant value to property subject to utilization as a roadway. We find that the valuation of $305.80 placed on that portion of defendants' property within the canal area accords some weight to the testimony of all the experts herein.
We find no merit in appellants' contention that the award of $50.00 for the temporary construction servitude is inadequate and should be increased. Williams' value of the servitude was $300.00 to $400.00. Munson's appraisal thereof was $200.00. A $10.00 valuation was set by Driggers. Again, we find that the trial court's allowance of $50.00 accords weight to the testimony of all the experts. We deem the award sufficient compensation for this item of damages.
Appellants concede the severance damages awarded in the trial court are adequate provided compensation for land taken is fixed at either $99,630.00 or $90,592.00, the appraisals given by Munson and Perkins, respectively. In answering the appeal, the Department contends severance damages should be denied altogether because *737 of accruing special benefits resulting from construction of the interstate and interchange, which special benefits far exceed the value of severance damages if any, in fact, occurred.
The special benefits alluded to by the Department consist of a change in zoning classification from A-1 and A-3 to A-4, which allegedly increased the value of defendants' remaining property. The Department also contends that defendants' tract is the sole privately owned property accessible to the diamond interchange in that the southeast quadrant of the interchange is owned by the state of Louisiana, and the three remaining quadrants are the property of defendants. This circumstance, the Department argues, benefits defendants only and makes defendants' remaining property adjacent to the interchange ramps extremely more valuable than before construction of the interchange.
In this connection, the Department sought to amend its petition by deleting its admission that severance damages were due in the sum of $21,692.00. As previously noted, the trial court eventually ruled the matter moot.
Appellants, relying on State v. Baddock, La.App., 170 So.2d 5; State v. Bordages, La.App., 156 So.2d 617, and LSA-C.C.P. art. 1151, contend the trial court properly rejected the Department's request to amend its petition. Appellants maintain that Baddock is authority for the rule that such amendments when allowed must be in writing and the Department offered no written amendment in this instance. The Department, however, argues that Baddock does not require a written amendment and that the Department may show by competent witnesses, without written amendment of its pleadings, that severance damages are due in an amount less than that deposited at the time of taking. The Department also urges that LSA-R.S. 48:456, in effect, permits the Department to show, without amendment of its pleadings, that severance damages are due in a sum less than that initially deposited. The Department points out that Section 456, above, expressly states that if compensation finally awarded exceeds the amount deposited, the landowner shall have judgment for the deficiency, and if compensation awarded is less than the deposit, the Department shall recover the excess.
LSA-C.C.P. art. 1151 provides that plaintiff may amend his petition without leave of court at any time before service of the answer thereto, otherwise, plaintiff may amend only with leave of court or with written consent of his adversary. The above procedural provision vests the trial court with considerable discretion in permitting amendments to pleadings. In the Official Revision Comments to LSA-C.C.P. art. 865, it is declared that pleading is not an end in itself, but a means to an end. LSA-R.S. 48:441, et seq. is unique in its procedural aspects. It is a special statute designed for a particular purpose. We believe that its provisions should be liberally construed so as to afford all parties to an action thereunder full opportunity to present their respective positions without infringing upon substantive rights of the other. LSA-R.S. 48:456 clearly permits the Department to recover excess deposits either for land taken or severance damages. In State v. Baddock, La.App., 170 So.2d 5, we initially held that the amount deposited by the Department for land taken was binding and that evidence was admissible only to establish its adequacy. We also held that as to severance damages, it could be shown on trial that the deposit for such damages was excessive, and that the Department is entitled to a refund of such excess. However, on rehearing in Baddock, we expressly held that the Department could prove at trial that the deposit of damages either for land taken or severance damages was excessive, and that a refund was due the Department in either instance. We also held that if the Department wished to show its deposit either for land taken or severance damages was excessive, *738 it was incumbent upon the Department to notify the owner by filing an amended petition setting forth its revision and to make satisfactory proof thereof upon trial. In Baddock, above, we stated: "Where, however, as in the case at bar, the Department has neither filed such amendment nor offered satisfactory explanation by competent witnesses of an excess of the deposit over the value shown upon trial, the landowner is entitled to the amount of the deposit." The Department relies upon this pronouncement as establishing the rule that written amendment of its pleading is not necessary in such instances. We concede the possibility of such interpretation. We take this opportunity to clarify any ambiguity in this regard.
In State, Through Department of Highways v. Christ Baptist Church, 197 So.2d 83, we reiterated in effect the rule announced in Baddock. In Christ Baptist Church, above, the owner objected to evidence offered for the purpose of proving a decrease in severance damages. The objection was based on the ground the pleadings would be enlarged. The trial court admitted the evidence subject to the objection. We also noted that the court could have permitted either party to amend should application to amend have been made. We also noted that both parties introduced evidence on the question of adequacy of severance damages. We held that under the circumstances no prejudicial error occurred since neither party established its contention.
As we noted in rehearing on Baddock, above, the purpose of the Quick Taking Statute is to afford the State immediate possession of the expropriated property. The amounts deposited are only estimated compensation. It is intended as a provisional, not a final settlement. Upon further consideration, we conclude the nature of these cases and the terms of the applicable statute require that the Department be afforded opportunity to amend in writing, even at trial, to assert that the deposit, either for land taken or severance damages, is excessive. Such request when made must be granted by the trial court. We likewise believe that the filing of such a written amendment will satisfy the requirement of notice laid down in Baddock, above. It may well be that granting a request for such a written amendment may, in the interest of justice, require granting the landowner a continuance to prepare for an unexpected contingency thus created. This, of course, is a matter which addresses itself to the sound discretion of the trial court. The trial court, citing Baddock, above, allowed the Department's evidence although no written amendment to the petition was offered. We now find we erred when we held in Baddock that such evidence could be tendered without a written amendment to the pleadings. LSA-C.C.P. art. 852 clearly states that all pleadings, including answers, must be in writing. We now hold that any such amendment must be in writing, otherwise such evidence shall be inadmissible as an enlargement of the pleadings.
The Department correctly argues that severance damages must be determined as of the time of trial. On this score, it is first contended that a change of zoning to an A-4 classification was reasonably foreseeable as of the time of taking. Alternatively, the Department maintains that the change in zoning to A-4 which did, in fact, occur by the time of trial, resulted from construction of the project. On either basis, the Department contends the resulting enhanced value offsets in full the amount of severance damages deposited, and return thereof is due by defendants. In the further alternative, the Department avers a remand of this matter is in order to permit evidence of a change of part of defendants' remaining property to a C-2 (Commercial) classification subsequent to the time of trial.
Severance damages may be diminished or offset by special benefits accruing to an owner's property as a result *739 of expropriation. Louisiana Highway Commission v. Grey, 197 La. 942, 2 So.2d 654. In City of Monroe v. Nastasi, La. App., 175 So.2d 681, and City of Monroe v. Carso, La.App., 179 So.2d 696, it was held that in assessing damages in cases of this nature, the reasonable possibility of a zoning change at the time of taking must be considered in assessing damages due the owner. We agree with this principle. In considering the possibility of zoning changes in such instances, each case must be determined in the light of its own peculiar facts and circumstances.
It has been held that where, as in the case at hand, a zoning change has, in fact, taken place between expropriation and trial, the test must be whether the zoning change resulted from the project involved. LSA-R.S. 48:453 provides that severance damages shall be determined as of the time of trial. A literal construction of the statute would dictate consideration of all operative factors existing at the time of trial even though such factors were not present at the time of taking. Such a rigid interpretation was rejected in State, Department of Highways v. William T. Burton Industries, La.App., 219 So.2d 837. In Burton Industries, above, the taking occurred in 1960, and the trial was held in 1967. With regard to the time of fixing severance damages, the court in Burton Industries, above, stated:
"In our view, however, the provision that severance damages be valued as of the date of the trial was statutorily intended to specify that the damages the remainder suffers should be reduced by special benefits which result to it from the completion of the highway construction, not to deprive the landowner of compensation for damages sustained by his tract because of any general increase in the value of land between the taking and the trial. We do not believe that the legislature intended to deprive a landowner of damages to his property undoubtedly caused him by the taking, simply becausein the long interval between the taking itself and the subsequent completion of the long-terms major highway construction projecthis property had increased in value due to generally improved economic conditions, along with all lands in the area (and, probably, most other lands in the entire State)."
We agree that the test in these instances must be whether the project itself causes or induces a zoning change which enhances the value of the owner's property. We believe that just as general appreciation in land values is not allowable in diminution of severance damages, so too, zoning changes, resulting from causes other than a completed highway project, may not be employed to offset severance damages. The reference to calculation of severance damages as of trial date in the pertinent statute merely provides an interval between taking and trial during which the developments following completion of the project can be determined and weighed by the trial court. If the court finds that an intervening zoning change has resulted from the project, or that a reasonable possibility of an enhancing zoning change exists, it should be considered in diminution of severance damages. If such a zoning change, or the reasonable possibility thereof, is attributable to factors unassociated with the taking, such as an increase in value due to generally improved economic conditions, the enhancement thus accruing to the owner may not be reduced by a diminution in severance damages due him.
Mr. Williams was of the opinion that a zoning reclassification of subject property to A-4 could not have been reasonably contemplated at the time of taking. He so believed from experience which established that most requests for zoning changes are denied by those agencies having charge of such matters. In the opinion of Mr. Perkins, each expressway interchange must be analyzed separately, in the light of its own peculiar circumstances, as to the possibility *740 of zoning changes and the effect such changes may have upon values. Mr. Perkins also observed that zoning changes are extremely unpredictable. He was of the further view that the expressway and interchange in question did not cause or bring about the change in zoning of subject property to A-4 classification following this taking. Perkins noted that when subject property was taken, there was no significant demand for A-4 property in the Baton Rouge area. He also testified that the increased demand for and interest in A-4 property which existed at the time of trial resulted from circumstances independent of and unrelated to construction of the expressway and interchange. Mr. Munson stated that rezoning of the northeast portion of defendants' remainder to A-4 occurred in spite of the expressway and not because of it. In this respect, he noted that A-4 apartment use of property was considered a detriment in that it would impede traffic flow in the vicinity of the interchange ramps.
Opposed to the testimony of defendants' experts on the question of the causes underlying the zoning change noted herein, Mr. Willet in essence testified to zoning changes attending other interchanges, notably interchanges at Perkins Road and College Drive, in the City of Baton Rouge. Properties adjacent to these interchanges had been rezoned Commercial. Defendants' experts acknowledged these zoning changes at other locations, but denied that they establish that change could reasonably be expected in this instance.
The Department's request for a remand to show a rezoning of subject property to Commercial classification following the time of trial must be denied. We believe the legislature has wisely and properly restricted proof of damages in these cases to such reasonable possibilities as exist at the time of taking, as reflected by the circumstances existing at the time of trial. To remand at this point would only lead to the possibility of a request for a subsequent remand based upon circumstances which have occurred since trial upon the initial remand. Such a situation would be intolerable. Every matter must have a terminal point. For the reasons stated, we cannot consider the leases which the Department has attached to its motion to remand.
We find the evidence preponderates in favor of the conclusion that the zoning change to A-4 which occurred following the taking in this instance cannot be attributed to construction of the expressway and interchange, but rather that such change resulted from circumstances independent of the taking and construction involved herein.
The evidence in this instance does not support the Department's alternative claim that subject property is specially benefited from the taking, because defendants are the sole private owners of property fronting on the diamond interchange. In this instance, defendants' property was zoned residential at the time of taking and for some time thereafter. The weight of the testimony is to the effect that, as residential property, subject property did not appreciate in value because of its fronting upon an interstate highway interchange. The Department did not establish that a zoning change for other purposes was reasonably possible as of the time of taking. Consequently, the fact that defendants possess the only privately owned property adjacent to the interchange is irrelevant to a computation of severance damages in this instance. As pointed out by defendants' appraisers, the proximity to the interchange is a detriment rather than a benefit insofar as residential use of the remainder is concerned.
We are mindful of Reymond v. State Department of Highways, 255 La. 425, 231 So.2d 375, wherein the Supreme Court, in a divided opinion (four to three), held that the criterion for assessing special damages is whether the damage is peculiar to the complaining owner. The Supreme Court *741 also asserted that damages suffered by owners in the general neighborhood are damnum absque injuria. In this respect, the court held that all neighboring owners to an expressway must suffer the damages of noise and unsightly view resulting from its existence and use, consequently such damages are general and not special to a particular owner. The court also held that even where such factors result in diminution of value, they are not compensable.
We find in this instance that the diminution in value of defendants' property results not only from the noncompensable factors mentioned in Reymond, above, but also from the loss of extensive frontage on Acadian, which renders the diminution compensable.
We find that the trial court erred in fixing expert witnesses' fees in the sums indicated. Mr. Dupree testified his fee for making certain maps showing the location, size and topography of subject property was $300.00, and his appearance in court $125.00. In addition, he charged $975.00 for certain subdivision plots which were rejected by the lower court. Mr. Perkins, who charged $1,900.00, stated he spent 8 days in preparation time and 8 days attending court. Mr. Williams stated he spent 50 to 75 hours in preparation time and appeared in court at least one day. His fee was $1,050.00. Mr. Munson, who spent 10 to 12 days in preparation and four days in court, stated his fee for preparation was $1,500.00 and $100.00 per day for four days court appearance, or $1,900.00.
In similar instances, an expert witness fee of $100.00 has been permitted for court appearance. State, Department of Highways v. Babineaux, La.App., 189 So.2d 450. We deem such a fee reasonable in this instance. We likewise consider a fee of $100.00 per day spent in preparation by a competent, qualified engineer or appraiser to be reasonable compensation for his services. In this instance, the awards made by the trial court approximate less than half the fees which we find are due Munson and Perkins, and only approximately two-thirds of that due Williams.
We find that Dupree's witness fee should be placed at $300.00 for the maps furnished, and $100.00 for his court appearance. Mr. Perkins' compensation is fixed at $800.00 for his 8 days of preparation and $800.00 for his court appearance, a total of $1,600.00. Mr. Williams' fee is fixed at $900.00 for 9 days preparation, and $100.00 for one day's court appearance, a total of $1,000.00. Mr. Munson's fee is fixed at $1,100.00 for 11 days preparation, and $400.00 for four days' court appearance, a total of $1,500.00.
It is ordered, adjudged and decreed that the judgment of the trial court be amended to increase the award to defendants-appellants for property taken from $45,296.00 to the sum of $90,592.00, and that all other awards for damages for land taken, land used, and severance damages be affirmed.
It is further ordered, adjudged and decreed that there be judgment in favor of defendants-appellants and against the State of Louisiana, Through the Department of Highways, in the total sum of $112,639.80, subject to credit in the sum of $54,299.00 deposited by the Department, with legal interest of 5% per annum on the sum of $58,340.80 from the date of the Department's deposit, until paid.
It is further ordered, adjudged and decreed that expert witnesses' fees are fixed and taxed as costs herein as follows: Sam Dupree, $400.00; Verdie Reece Perkins, $1,600.00; Kermit Williams, $1,000.00; and William Warren Munson, $1,500.00.
It is further ordered, adjudged and decreed that the State of Louisiana, Through the Department of Highways, is cast for such costs of these proceedings as the law permits.
Amended and affirmed.

*742 ON REHEARING
En Banc.
ELLIS, Judge.
We granted the rehearing herein so that we might reconsider the method of evaluation recognized by us in our original opinion, as well as other issues therein determined. The facts of the case and issues are more than adequately discussed in our original opinion.
We remain firm in our conviction that, in the absence of a written amendment to the pleadings alleging the propriety thereof, the Department may not claim a reduction of the amounts deposited at the time of the taking. We further reaffirm our holding that no special benefits accrued to the remainder of defendant's property as a result of the construction of the interchange at the intersection of Interstate Highway 10 and South Acadian Throughway.
In determining the value of the parcel taken, we are governed by R.S. 48:453 and R.S. 19:9, which provide that the value is to be determined as of the time of the taking, without considering any enhancement or damage to its value as a result of the improvement to be constructed. State Through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6 (1963).
In determining severance damages when there has been a partial taking, we must first find the value of the entire tract as it was prior to the taking and without considering the effect of the improvement. Next, the value of the remainder, immediately after the taking as enhanced or damaged by the taking must be found. If any part of the enhancement or damage is general as to all properties similarly situated, such part may not be considered in arriving at the "after" value of the remainder. To the after value, so determined, must be added the compensation paid for the part taken. If the sum of these two is less than the before value, the difference is the severance damage suffered by the property.
If, at the time of the trial, the Department is able to prove that the property has enjoyed special benefits as the result of the improvement, these may be offset against the severance damages. General benefits, such as are common to all properties similarly situated, or which have resulted from economic expansion, may not be used to offset severance damages. See State through Dept. of Highways v. Hayward, supra; State Through Dept. of Highways v. William T. Burton Industries, 219 So.2d 837 (La.App. 3 Cir. 1969).
In our original opinion, we found the value of the property, before the taking, to be $8,000.00 per acre for the 20.524 acres of usable land, and $200.00 per acre for the 2.909 acres in the canal. This gives a total "before" value to the property of $164,773.80.
The part taken consists of 7.191 acres, of which 5.662 acres is usable land, and 1.529 acres is in the canal. In placing a value thereon in our original opinion, we adopted defendants' contention that, because of the peculiar shape of the property, and the amount of road frontage taken thereby, a willing seller could command a much higher price from a willing buyer for the specific piece taken. We awarded, on the basis of some of the expert testimony in the record, double the average per acre value for the usable land taken.
The Department contends that we erred in this respect. It claims that the higher value of the frontage taken is merely a reflection of the damage to the remainder caused by loss of access. They claim the award should be on the basis of the average per acre value, and the loss in value of the remainder should be compensated by severance damages.
In the ordinary case in which there is damage to the remainder by virtue of the taking, either approach should lead to *743 the same result in terms of the total award, because compensation and damages, when added to the after value of the remainder, excluding general benefits, can be no greater than the before value of the entire tract. A higher value on the parcel taken can only result in a lower award for severance damages, and vice versa. It is to be noted, however, that severance damages can be reduced by the value of special benefits enjoyed by the remainder as a result of the improvement, whereas compensation for the value of the property may not.
It is, therefore, to the advantage of the landowner to receive higher compensation and smaller severance damages if his property has received special benefits. It is to the advantage of the Department that the compensation be low and the severance damages high in a similar situation.
In deciding such cases, the courts must see that both the landowner and the State are fairly treated, and that the landowner shall suffer no loss as the result of the taking, other than that which may be suffered by all who are similarly situated. See Reymond v. State Department of Highways, 255 La. 425, 231 So.2d 375 (1970).
The arguments advanced by the parties hereto in support of their respective positions are cogent and convincing, and each urges the necessity of adopting the appraisal technique likely to produce the most favorable result for him. We find it unnecessary to adopt either theory, since in this case, the total amount of the award must be the same in either case. We do not believe that the courts should be bound to any particular appraisal technique, since a method of valuation which would produce an equitable result in one case might result in injustice in another. We think that each case must be viewed in the light of its own circumstances, and the result reached which does substantial justice to all parties. We should not be tied to appraisal techniques which, when applied blindly, can lead to absurd results.
We have already found the before value of the property to be $164,773.80. The remainder of the property totals 16.242 acres, including 14.862 acres of usable land and 1.38 acres in the canal. Our evaluation of the expert testimony leads us to the conclusion that, immediately after the taking, the remainder of 12.320 acres lying north of the Interstate had a value of $5,000.00 per acre; the 2.542 acre remainder south of the Interstate had a value of $4,000.00 per acre; and the remainder of 1.38 acres in the canal was worth $200.00 per acre. This gives a total after value for the remainder of $72,044.00.
The difference of $92,729.80 between the foregoing "before" and "after" values must of necessity be the total award to which defendants are entitled, including both compensation for the parcel taken and severance damages.
If we adopt the defendants' theory, the computation of the award would be as follows:

Before value $164,773.80
After value $72,044.00
Compensation 90,592.00 162,636.00
 __________ ___________
Severance damages $ 2,137.80
Under the Department's theory, the computation
would be:
Before value $164,773.80
After value $72,044.00
Compensation 45,296.00 117,340.00
 ___________ ___________
Severance damages $ 47,433.80

In either case, we have pointed out, the award is the same, or $92,729.80. If, however, we were to adopt the appraisal technique advocated by defendants, we would find ourselves in the position of awarding $90,592.00 as just compensation, in addition to the $21,692.00 in severance damages deposited by the Department, reduction of which cannot be claimed by the Department because of their failure to amend their pleadings. This award, when added to the after value of the remainder, $72,044.00, would be almost $20,000.00 in excess of the before value of $164,773.80, which should be the upper limit of the total of those three items, in the absence of general benefits.
*744 We think that justice dictates that defendants be awarded no more than $92,729.80, and we believe the result to be permitted by the pleadings, despite the failure of the Department to amend its petition to the severance damages deposited. As pointed out above, in reaching this conclusion, we do not adopt either theory of appraisal advanced by the parties.
The judgment appealed from is, therefore, amended so as to award defendants the sum of $92,729.80 for just compensation and severance damages, plus $50.00 for the value of the temporary construction servitude, or a total of $92,779.80, and, as amended, it is affirmed, with plaintiff to be cast for all costs for which it may be legally liable.
Amended and affirmed.