YELVERTON, Judge.
The Parish of East Baton Rouge expropriated certain immovable property belonging to Joseph Cantu. The purpose of the expropriation was the acquisition of full ownership of certain land belonging to defendant for drainage, drainage maintenance and other public purposes, together with a temporary servitude for construction purposes incident to the improvement.
Prior to the taking, a natural drain known as the Lobdell Lateral of the North Branch of Ward Creek, crossed defendant’s property. The improvement of this lateral was part of a Parish project known as the “1965 Capital Improvement Program”. The Lobdell Lateral portion of the project consisted of the widening and deepening of the natural drain, as well as lining it with concrete, enclosing parts of it with a chain link fence, and installing underground boxed culverts at crossings. To accomplish this, it was necessary that the Parish acquire in full ownership not only the existing drainage ditch but also additional property on either side. Further additional space was required during the construction period, which we will herein refer to as the construction servitude.
For the property taken in full ownership, the Parish tendered $17,279. It offered $806 for the temporary construction servitude. It offered $100 for the costs involved in the relocation of a metal building situated on the property. Of the total sum of $18,185 offered, defendant accepted only the $100 tendered for relocation of the building.
Judgment was rendered on December 3, 1968, decreeing the Parish the owner of the land sought to be expropriated in full ownership, and of a temporary construction servitude on the land needed for construction purposes. Subsequently, issue having been joined as to the just compensation to which the owner was entitled, judgment was rendered on July 5, 1974 in favor of Cantu and against the Parish awarding $20,235 as compensation for the land taken, $4,600 as rental on the construction servitude, together with additional rental at the rate of $920 per year from December 3, 1973 (the date of trial of the compensation issue) until such time as all debris was removed from the construction servitude and all usage of the construction servitude sites by the Parish had ceased, and $335 for the cost of relocating two portable buildings, subject to a credit of the $100 previously paid. From this judgment defendant appealed asking for a substantial increase in the award. We affirm.
In seeking an increase in the total award, Cantu assigns four specifications of errors. He urges that we find manifest error in the following conclusions reached by the trial court.
I. A reasonable possibility of rezoning did not exist as of the date of the taking.
II. The adoption of the market valuations reached by the Parish’s expert, Lorin Willett.
III. The adoption of a $1 valuation for land taken from the canal area as it existed before the taking.
IV. The disallowance of the defendant-appellant’s claim for severance damages.
We will address ourselves to these assignments of errors seriatim.
I. POSSIBILITY OF REZONING
After evaluating the testimony of two real property appraisal experts for each side, the trial court resolved the “critical issue of rezoning probability” adversely to the defendant. It is this conclu *904 sion of the trial court that defendant most wants to overturn, because the experts differed sharply in their opinions as to the highest and best use of the property, plaintiff’s experts opining that the highest and best use of most of the property was residential, in which classification (A-l) it was zoned at the time of the taking (December 3, 1968) and remained so, and defendant’s experts being of the opinion that the highest and best use was commercial (C-l), based on the premise that there existed on December 3, 1968 a reasonable probability that the property would be rezoned commercial. It is this basic difference of opinion which accounts for the marked disparity between the experts’ evaluations of both the property taken and severance damages, and which constitutes the essential predicate upon which the appeal is largely founded.
In order to consider this issue it is first necessary to describe the property.
Defendant’s property is on the west side of Lobdell Avenue. Lobdell runs north and south. Lots 39, 40 and 41 of Good-wood Estates each fronts ISO feet on the west side of Lobdell Avenue by a depth of 600 feet between parallel lines. Lot 39 is the northernmost and Lot 41 the southernmost of these three lots. Cantu owns all of Lots 40 and 41 but only the western 450 feet of Lot 39; a ISO foot square portion of Lot 39 fronting on Lobdell Avenue is not owned by him. Therefore, Cantu’s frontage on Lobdell Avenue is limited to Lots 40 and 41, each having 150 foot frontage. Both on the date of the taking and on the date of trial, all of this property was zoned single-family residential with the exception of a parcel fronting 240 feet on Lobdell Avenue and extending west 200 feet between parallel lines, being in the southeast corner of the three lots considered as a whole, which is zoned commercial. Again considering the three lots as a single tract, and keeping in mind the non-owned status of the 150 foot square in the northeast corner thereof, the Lobdell Lateral drainage ditch enters defendant’s property very near the northeast corner of the owned portion of Lot 39 and flows south by southeast, exiting a little north of the southeast corner of Lot 41. It will be noted that all of the frontage of Lot 41, where the drainage canal exits, is zoned commercial, while only the south 90 feet of the Lobdell frontage of Lot 40 is zoned commercial; the remainder of that lot frontage on Lobdell Avenue is zoned single-family residential. The improvements placed on the property did not substantially alter the course and direction of the old natural drain, but the property taken in full ownership, including the old drainage canal, comprised about three times the area of the old canal.
Prior to the taking, the western portion of Lots 40 and 41, (opposite the drainage canal from Lobdell Avenue) was accessible to defendant only by virtue of the fact that he had been allowed by the Parish to place in the canal two old railroad tank car bodies as water conduits over which he had laid a vehicular bridge to reach his home situated some distance back from Lobdell Avenue. These tank car bodies were each 27\/2 feet long; placed side by side, they afforded support for a bridge 271/2 feet wide. The improvement called for these tank car bodies to be replaced by box culverts, which with the surfacing provided by the drainage improvement project, now provides a passageway variously estimated by the witnesses as having a width of a minimum of 50 feet to a maximum of 100 feet. The uncovered portion of the improved canal across defendant’s property is bordered on either side by a chain link fence.
Both of defendant’s real estate experts based their evaluations upon the premise that there was a reasonable probability of a zoning change which would result in all of Lots 40 and 41 being zoned commercial, thus enjoying a considerably higher market value than if the land remained zoned approximately two-thirds residential. To give it its optimum value for commercial use, defendant’s experts *905 each agreed that box culverts would have to be extended all the way across Lots 40 and 41 and covered ov_r, which they considered economically feasible. The cost of laying box culverts and covering the ditch running across both lots was estimated by a consulting engineer, Allen L. Cox, testifying for defendant, at $46,297 as of the date of the taking in 1968. After deducting this cost, defendant’s expert Curtis Book, an independent field appraiser, concluded that the value of the land taken was $44,568, and Kermit A. Williams, the other of defendant’s appraisers, concluded that its value was $42,888. In reaching these conclusions of value, which we do not consider it necessary to examine here in greater detail, these witnesses based their valuations upon their assertion that there was a probability that the property would be rezoned to a commercial classification and that the owner would invest in the necessary box culverts and covering of the entire canal across those two lots.
The Parish’s two expert land appraisers, George S. Platt, Jr., and H. Lorin Willett, on the basis of their analyses, concluded that there was only a slight, if any, chance that the property would be rezoned to commercial classification. Platt’s conclusion as to the value of the land taken was $16,926. Willett’s was $20,235.
Thus it was that the trial court rightly regarded the issue of rezoning probability as a critical one. His conclusion regarding this issue which we consider sound and amply supported by the evidence is here quoted:
"... It is encumbent upon the land owner to show that there is a reasonable expectation that property may be so used or developed in the not too distant future in order that a proposed use be considered in determining market value of expropriated land. See Parish of East Baton Rouge v. Stipe, La.App., 231 So.2d 665 (1970). The defendant herein has failed to establish the reasonable possibility of a zoning change for his property. This is particularly true with regard to the rezoning of the balance of Lots 40 and 41 to a C-l or commercial status. A careful review of all of the evidence in this case pertaining to the question of rezoning leads us to the conclusion that such a possibility is speculative, to say the least. Market value cannot be based on mere speculation. Potential use of land must be removed from the realm of guesswork, speculation and conjecture. See also Central Louisiana Electric Co. v. Mire, La.App., 140 So.2d 467; Central Louisiana Electric Co. v. Harang, La.App., 131 So.2d 398; Plaquemines Parish School Board v. Miller, 222 La. 584, 63 So.2d 6; Recreation & Parks Commission, Parish of East Baton Rouge v. Loret, La.App., 203 [263] So.2d 467; State Dept. of Highways v. Mayer, La.App., 257 So.2d 723; and Recreation & Park Commission for East Baton Rouge Parish v. Drago, La.App, 247 So.2d 908.
“A thorough consideration of possible rezoning of defendant’s property was made in this case by Mr. Lorin Willett, an expert appraiser called by the plaintiff. We agree with his conclusion that only a very slight chance of success ever existed or does now exist. It is significant that on two occasions an owner directly across the street from defendant’s A-l segment has been denied a change from A-l to C-l. These denials occurred May 22, 1967 (before the taking herein) and November 24, 1971 (almost three years after the taking). It is also significant that thirteen owners along Lobdell Avenue in the block to the north of defendant were denied B-l (transitional) status for their respective properties on November 24, 1971. We are not impressed with the successful zoning changes made in the area to the south of defendant’s property and along Jefferson Highway. As stated by Mr. Willett, that area is ‘an entirely different neighborhood.’ Nor can one overlook the active lobbying efforts of the Goodwood Home *906 owners Association to preserve their neighborhood’s residential character. That part of defendant’s property now zoned C-l acquired its status many years ago as the result of an overall comprehensive zoning ordinance and as of December 3, 1968, the date of taking, there existed little possibility of it being rezoned to C-l status in the foreseeable future. This conclusion is not dictated by but is certainly fortified by the hindsight that can now be applied to the last five years of zoning experiences in the area.”
We are in accord with the trial court’s conclusions regarding this issue.
We will next proceed to a discussion of defendant’s second assignment of error, that the trial court erred in adopting the market valuations reached by plaintiff’s expert H. Lorin Willett.
II. MARKET VALUATIONS OF H. L'ORIN WILLETT
This witness concluded that at the time of taking, December 3, 1968, the value of the commercial (C-l) part taken was $1.25 per square foot, and the value of the residential (A-l) part taken was $.50 per square foot, which calculated out to $20,-235 as just compensation for the property actually taken. He concluded that the value of the construction servitude was $920 annually using the same per square foot values and an 8% per year factor. Finally, the cost of relocating two (not one) portable buildings, was determined to be $335.
All four appraisers who testified in the case used the “market value approach”. The trial court felt that the conclusions of Willett as to value drawn from the data related by him, as compared to the data used by the other appraisers, constituted the most logical and reasonable basis upon which an award could be made in the case. The trial court accordingly followed these evaluations in rendering its judgment. We agree with the trial court’s adoption of Willett’s conclusions. Our concurrence in this result is of course partially mandated by the earlier discussed conclusion that the highest and best use of the whole property cannot, on the facts of the case, be regarded as having a potential likelihood of upward reclassification, and we are therefore required to reject the evaluations of the owner’s experts because they are based on a rezoning probability.
III. THE VALUE OF THE OLD CANAL
Both of plaintiff’s experts assigned a token $1 valuation for the land comprising the old drainage canal as it existed before the taking. Their reasoning was that the land comprising the canal itself was committed perpetually to drainage use and, therefore, it was useless for any other purpose. Every witness agreed that the cost of box culverts and the covering of the remainder of the canal, which would have given that space limited utility, would be economically feasible only if the highest and best use of the property can be considered zoned commercial, a possibility we have previously rejected. The cost incident to reclaiming the canal would be prohibitively excessive in light of the present zoning classifications and the values based thereon. Therefore, the value of the land' comprising the old canal must be considered in light of its having no higher potential utility than to remain a canal, and, as such, a valuation of $1 was proper.
Of course, the experts for the landowner did not place a value on the old canal area that did not take into account their opinions that there was a likelihood of rezoning. Once again, we see how critical the resolution of the issue of the possibility of rezoning is to this case.
We find no error in the trial court’s resolution of this issue.
*907 IV. SEVERANCE DAMAGES
While recognizing that defendant’s property was burdened with limited access before the taking, and that after the taking, the existing access was not diminished, the landowner nevertheless urges that before the taking it would have been possible to cure the access problem by laying culverts and covering over the entire canal, thus rendering the entire 300 feet of frontage of Lobdell Avenue fully usable as commercial property. The presence of the chain link fence effectively prevents any hope of future additional access and therefore, owner argues that the consequent devaluation is the measure of severance dam-wages. In its resolution of this issue, we quote the following language of the trial court:
“Another conclusion reached by the Court in this case is that it is simply not true that the defendant has been completely cut off from Lobdell Avenue by the drainage improvement project. To the contrary, it is inescapable that the defendant now has much better access to that portion of his property lying to the west of old Ward Creek. From a vehicular passageway of twenty-seven and one-half feet, it appears that access to the west of approximately seventy-five feet has been afforded the defendant. It cannot be assumed that the Parish will ever deprive the defendant of this improved access. To the contrary, as testified to by Mr. William W. Addison, a Civil Engineer for the Department of Public Works, it is the policy of the Parish to see that an owner is left with at least the same access he had before improvements are constructed. In this case, the Parish has done much better by Mr. Cantu. In this respect, this case is easily distinguishable from Stipe, supra, and from Parish of East Baton Rouge v. Nilson, La.App., 271 So.2d 622.
“In Stipe, severance damages were awarded for a 9.03 acre tract which was separated from other property by a large canal that was constructed. These 9.03 acres were actually cut off from the larger tract by the drainage channel. The Court held: . .we find that this land will now be separated from the other property of the defendants by a very large canal. In effect, the defendants no longer have access to this land.’ (Emphasis supplied.) In Nilson, the Court found that a substantial portion of the property would be completely cut off as a result of the taking for improvement of the canal traversing the property. The diminution in the value of the property after the taking was apparent and the court awarded the cost of a bridge to span the improvements constructed so that Mr. Nilson would have access to the rear of his property. The rationale of Nilson precludes an award of severance damages in this case based on the premise that the defendant has been deprived of access, and therefore, adequate usage of the property lying to the west of the canal. Of course, the Nilson case is of particular interest in that the property involved therein is only a few hundred feet from Mr. Cantu’s property and was the subject of the same construction project. The applicability of its rationale as regards access is compelling.”
We note once again that the approach to a determination of severance damages utilized by the landowner’s experts was based entirely upon the assumption of a rezoning and that all of Lots 40 and 41 would enjoy a commercial zoning as their highest and best use. We are in accord with the findings of the trial court as to the issue that no severance damages are due.
For the reasons assigned, the judgment of the trial court is affirmed.
Affirmed.